IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

DARRELL L. QUINTRELL,

     Plaintiff,

v.                              CASE NO. 2:10-cv-01253

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. Both parties have consented in writing to a decision by the United States Magistrate Judge.

The plaintiff, (hereinafter referred to as "Claimant"), filed an application for DIB on March 31, 2008, alleging disability as of February 13, 2008, due to a seizure disorder, generalized anxiety disorder with depression, headaches, tinnitus and bilateral hearing loss. (Tr. at 40, 153.) The claim was denied initially and upon reconsideration. (Tr. at 83-87, 88-90.) Claimant requested a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on September 10, 2009, before the Honorable Marc Mates. (Tr. at 50-79.) By decision dated October 16, 2009, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 40-49.) The ALJ's decision became the final decision of the Commissioner on August 27, 2010, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4.) On October 25, 2010, Claimant brought the present action seeking judicial review

of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2009).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 404.1520(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f).  The Commissioner must show two things: (1) that the

claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he did not engage in substantial gainful activity since February 13, 2008, his alleged onset date. (Tr. at 42.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of seizure disorder, tinnitus and bilateral hearing loss. (Tr. at 42.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 43.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 44.) As a result, Claimant could not return to his past relevant work as an equipment operator, welder and truck driver. (Tr. at 47.) The ALJ concluded that Claimant could perform the jobs of mail clerk, office helper, price marker, route clerk, retail order clerk and grader/sorter. (Tr. at 48.) On this basis, benefits were denied. (Tr. at 49.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner in this case is supported by substantial evidence.

Claimant's Background

Claimant was forty-six years old at the time of the administrative hearing.  (Tr. at 54.) Claimant graduated from high school and received vocational training in welding after graduation.  (Tr. at 55.)  In the past, he served in the military in Germany and Iraq.  (Tr. at 56, 64.)  Claimant also worked for a contractor for the phone company running heavy equipment, at a stamping plant and for the Department of Highways operating heavy equipment.  (Tr. at 56, 63-64.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it briefly below.

The evidence of record includes treatment notes predating Claimant's onset of February 13, 2008.  The court has reviewed those records, but will not summarize all of them here.  Veterans Administration Medical Records

Prior to his onset, Claimant suffered from headaches, dysthymia and anxiety, among other impairments.  Many of Claimant's impairments stem from his service in Iraq and

Kuwait as a chaplain's assistant. (Tr. at 334.) On March 23, 2005, and November 14, 2005, Veteran Affairs Rating Decisions determined that Claimant's tinnitus, bilateral hearing loss, headaches, generalized anxiety disorder, depression, dysthymia and insomnia and dental problems were service related. (Tr. at 818, 822, 826.)

On March 9, 2007, Claimant was diagnosed with anxiety not otherwise specified and dysthymia. (Tr. at 277.)

In addition, prior to his onset date, on March 21, 2007, Claimant had a seizure. He had no history of seizures. (Tr. at 261, 784.) Claimant was in a waiting area of a garage getting his wife's car fixed when the seizure occurred and had no recollection of what happened. People around him reported seizure like activity. Claimant never lost control of his bowels, but had a few drops of urine in his underwear. (Tr. at 266.) A CT of the head was negative and an EKG did not show any acute changes. Claimant had elevated liver function tests. (Tr. at 264.)

On March 28, 2007, Claimant experienced a sense of lightheadedness while standing. Within moments he felt paresthesia in the right distal leg quickly spreading to his entire body. He eventually fell unconscious and awakened without injury. The event was not witnessed by others. (Tr. at 448.)

An MRI of the brain without contrast on April 2, 2007, showed no acute intracranial abnormality. (Tr. at 807.)

On January 4, 2008, Claimant experienced a seizure episode and wrecked his car. (Tr. at 524.) Claimant experienced bladder incontinence and bit his tongue during the seizure. Claimant had been taking Depakote, and his levels were subtherapeutic. Lawrence Clapp, M.D., a neurologist, recommended changing his medication to Dilantin. (Tr. at 430,

492.) Dr. Clapp instructed Claimant not to drive a car or operate machinery. (Tr. at 492, 814.)

A CT of Claimant's head on January 6, 2008, revealed sinus disease, but no definite intracranial abnormality. (Tr. at 781.)   On February 8, 2008, Mahmoud A. Mohamed, M.D., a staff psychiatrist, examined Claimant. Claimant's mood was stabilizing with increase in fluoxetine. Tremors and involuntary movements remained an issue. Creatine Phosphokinase ("CPK") was climbing up from the 200s to the 300s. Claimant had discontinued Depakote after elevated liver function tests. (Tr. at 483-84.) Dr. Mohamed encouraged Claimant to apply for disability due to seizures and to avoid driving. (Tr. at 484.)

On February 14, 2008, Dr. Clapp, examined Claimant. He diagnosed Claimant with a seizure disorder. He discussed with Claimant the need to restrict activity that might be dangerous if he has a seizure, but he also stated that the "fact [that Claimant has a] seizure disorder should not prevent hi[m] from other duty." (Tr. at 479.)

On February 21, 2008, Claimant was seen by a mental health outpatient physician because he was extremely worried about returning to work. He was worried about hurting himself or others if he has unexpected seizure activity. (Tr. at 476.) Dr. Mohamed's assessment was that Claimant's mood was stabilizing with an increase in fluoxetine, however, Claimant's CPK continued to be climbing gradually. Tremors and involuntary movements continued to be an issue. Claimant was not able to handle stress and it was affecting his functioning. Dr. Mohamed gave Claimant a three week leave of absence pending a second neurology opinion. (Tr. at 478.)

On March 17, 2008, Claimant called the VA complaining that he was feeling anxious

6

after discontinuing fluoxetine.  He was also feeling stressed because his license was not renewed because of the seizure diagnosis.  Dr. Mohamed explained that he was concerned that Claimant's CPK was climbing possibly because of the fluoxetine.  He recommended that Claimant increase of the Diazepam until he could be seen.  (Tr. at 1255.)

On March 18, 2008, Dr. Clapp noted that Claimant had not suffered a recurrent seizure.  He continued to use Dilantin, but was not taking the Depakote.  He was in the low therapeutic range.  Dr. Clapp continued Dilantin.  (Tr. at 474.)

On March 30, 2008, Claimant's license was suspended because of his seizure condition.  (Tr. at 812.)

On April 25, 2008, Dr. Mohamed saw Claimant for treatment of his seizure disorder, general anxiety disorder and depressive disorder not otherwise specified.  Claimant reported that he had hit rock bottom and could not handle the stress of being off work.  Claimant reported sleep difficulties.  (Tr. at 1250.)  Dr. Mohamed found that Claimant was presenting with depressive mood symptoms.  He was having psychosocial problems, which were contributing to his affective disorder.  Dr. Mohamed restarted Claimant on fluoxetine.  (Tr. at 1251.)

On May 9, 2008, Afroza Sultana, M.D. examined Claimant in follow up.  He had no new complaints.  His hypertension was stable. (Tr. at 1244.)  His Creatine Kinase ("CK") was 11.9, but he had been out of medications for three days the week before.  He had had no seizure recently.  He was on fluoxentine and Diazepam for his depressive disorder.  Claimant had a loose stool, possibly medication induced.  He had a history of migraine headaches with use of motrin.  Claimant reported his headaches were not well controlled. (Tr. at 1245.)          On May 19, 2008, Claimant saw another neurologist on an outpatient

7

basis.  Despite a mild CK elevation, Claimant did not appear clinically to show myopathy (weakness).  Claimant reported he had seen another neurologist outside the VA system in February of 2008, and that the assessment indicated that he has now controlled seizures when on Dilantin and the tremor he developed during Depakote treatment has now diminished markedly.  Claimant reported no seizures since January.  The impression was seizures of unknown etiology and history of migraine headaches.  (Tr. at 1239.)

On May 19, 2008, Dr. Mohamed saw Claimant for his mental condition.  Claimant's mood was "stabilizing well.  Claimant had multiple psychosocial stressors, which he is handling fairly well at this point."  (Tr. at 1243.)

On June 2, 2008, Claimant underwent an electrodiagnostic evaluation for possible myopathy due to elevated CK levels.   (Tr. at 1181.)   Claimant had symptoms of predominantly right lower extremity weakness with pushing off using his calf muscles which was only detected by neurological evaluation.  Claimant had no history of back trauma.  Claimant had no electrodiagnostic evidence of myopathic process on testing of the right lower extremity.  There were electrodiagnostic findings suggestive of a non active, right sided neurogenic condition, most likely a previous radiculopathy involving L4-L5 and S-1 innervated muscles.  There was no evidence of muscle membrane irritability to suggest an acute picture.  (Tr. at 1182.)

On July 1, 2008, Claimant complained of fatigue and muscle aches in his legs, all of which began about the time he started treatment for his seizures.  (Tr. at 1213.)  On examination, Claimant had muscle weakness in flexion of the toes of both feet.  (Tr. at 1221.) Claimant's CPK was minimally elevated as 213.  "The significance of this is probably nothing but the etiology is unclear as this is a non specific test.  His Dilantin level is 13.9.

This is the therapeutic range." (Tr. at 1228.)  Claimant was no longer driving due to seizure activity.  (Tr. at 1229.)  Gene L. Duncan, the staff physician who examined Claimant, felt that the fatigue was likely related to depression.  (Tr. at 1229.)  Claimant also reported weekly headaches.  (Tr. at 1231.)  Dr. Duncan felt that Claimant could do light and sedentary work.  (Tr. at 1230, 1235.)

On July 11, 2008, Clifton R. Hudson, Ph.D. conducted a psychological assessment and diagnosed anxiety disorder, not otherwise specified and depressive disorder not otherwise specified on Axis I and made no Axis II diagnosis. He rated Claimant's GAF at 50. (Tr. at 1211.)

On July 30, 2008, Claimant telephoned the Veterans Administration Medical Center and reported that he had had a sudden memory loss that lasted about five minutes. Claimant felt the way he felt the last time he had a seizure.  Claimant wanted Dr. Clapp to be notified.  (Tr. at 1204.)  On August 11, 2008, an addendum to the telephone note states that Claimant had a typical migraine following the event and that Claimant possibly had a partial seizure.  (Tr. at 1203.)

On August 26, 2008, it was noted that Claimant had recently been fitted for a hearing aid in the left ear.  (Tr. at 1193.)

On August 26, 2008, Dr. Clapp examined Claimant.  He had not suffered any altered awareness since the last episode.  Claimant reported feeling a constant sense of imbalance. Dr. Clapp noted a normal EMG study and that Claimant's CK continued to run mildly high. Dr. Clapp's impression was seizure disorder suspected with breakthrough partial seizure recently.  Dr. Clapp discussed with Claimant, the possibility of increasing his Dilantin on a trial basis, and Claimant was agreeable.

On August 27, 2008, Claimant was seen at the mental health outpatient clinic. Claimant reported that psychotropic medication has been very helpful. He was not very anxious or depressed. Claimant still had some days when he feels down or depressed. (Tr. at 1188.) Dr. Mohamed noted that Claimant had residual depressive symptoms and anxiety. Claimant reported he was stressed today. Claimant was to continue fluoxetine and Diazepam. (Tr. at 1190.)

On November 5, 2008, the Department of Veterans Affairs issued a rating decision on Claimant's application for a new claim for benefits. It found that Claimant's generalized anxiety disorder with depression, previously dysthymia, and insomnia, which was currently 50 percent disabling, continued; that Claimant's headaches, which was currently 30 percent disabling, continued; that evaluation of Claimant's bilateral hearing loss, which was zero percent disabling, continued; that Claimant's service connection hypertension was denied; that service connection muscle aches in the thighs and calves (claimed as fatigue, muscle pain and cramps) was denied; that service connection for tremors was denied; that service connection for blurry vision was denied; that previous denial of service connection for seizure disorder secondary to medication for other service connected conditions was confirmed and continued; and that entitlement to individual unemployability was denied. (Tr. at 1399-1400.)

Other Medical Records

Lincoln Primary Care Center

The record includes treatment notes from Gregory A. Elkins, M.D. and others at Lincoln Primary Care Center dated March 5, 2008, through September 10, 2008. On March 5, 2008, Claimant wanted to go to the Cleveland Clinic for a second opinion on his

seizure disorder, but insurance required him to exhaust all local options.  Syam Stoll, M.D. agreed to try to get prior authorization for Claimant to be seen at the Cleveland Clinic.  (Tr. at 1320.) On March 11, 2008, Dr. Elkins saw Claimant in follow up for his seizure disorder. Claimant was awaiting an appointment with the Cleveland Clinic.  He was to continue medication as prescribed and return in two months.  (Tr. at 1321.)  On May 6, 2008, Claimant reported no further seizures and that his tremor "may be better."  (Tr. at 1323.) Dr. Elkins diagnosed seizure disorder, generalized, probable chemical exposure.  He referred Claimant to occupational medicine.  (Tr. at 1323.)  On May 28, 2008, Robert Walker, M.D. examined Claimant and found that he had a seizure disorder under reasonable control with Phenytoin, tremor on the right which may be due to Dilantin, mild incoordination, due to Dilantin and rule out "maganeses toxicity, other toxicity related to military assignment."  (Tr. at 1324-25.)

On June 18, 2008, Dr. Walker found that Claimant had a seizure disorder, generalized, tremor, weakness in the right lower extremity and ataxia.  He recommended an EEG and neurology consult.  (Tr. at 1326.)

On July, 29, 2008, Dr. Elkins examined Claimant and noted he had had no further seizures.  Claimant wanted to cut back on his seizure medication.  Dr. Elkins diagnosed seizure disorder, generalized, tremor, incoordination, right sided and hypertension.  (Tr. at 1328.)  Dr. Elkins wrote a "to whom it may concern note" on July 29, 2008, that Claimant's "Seizure Disorder has been aggravated by Insomnia, Depression, and Anxiety Disorder."  (Tr. at 1383.)

Claimant saw Dr. Walker on July 30, 2008.  He diagnosed seizure disorder, generalized, hypertension and urinary hesitancy.  (Tr. at 1330.)  On September 10, 2008,

11

Dr. Walker noted that Claimant had recently increased his Dilantin. The diagnosis remained unchanged. (Tr. at 1331.) On December 8, 2008, Dr. Walker wrote that Claimant's "Seizure Disorder is cause[d] by and/or aggravated by his service connected Anxiety Disorder, Insomnia and Depression." (Tr. at 1406.)

On March 6, 2009, Dr. Elkins noted that Claimant had had no seizures since he was last seen, but that he still had some tremor. Claimant's blood pressure "has been good." (Tr. at 1407.) Claimant was having sleep difficulty. Dr. Elkins diagnosed seizure disorder, generalized, hypertension and tremor. (Tr. at 1408.)

On April 23, 2009, Claimant reported to Dr. Elkins that two days ago he was sitting on the couch and then found himself in the floor. He had bitten his tongue and had urinary incontinence. Claimant had been off Dilantin for several months. Claimant had a slight tremor in the right hand, and he was slightly unsteady during the Rhomberg. The diagnosis remained unchanged. He prescribed Divalproex and ordered blood work. (Tr. at 1409-10.)

On May 28, 2009, Dr. Elkins noted that Claimant had good compliance with his seizure medications and had had no seizures since his last visit. (Tr. at 1411.) His assessment was seizure disorder, generalized. (Tr. at 1412.)

Suresh Kumar, M.D.

On February 27, 2008, Suresh Kumar, M.D. examined Claimant related to his seizures and tremors. Claimant reported a total of four seizures, the last one in January of 2008. Dr. Kumar recommended that Claimant continue his current dosage of Dilantin since he had started it about a month ago and had had no further seizures. He encouraged Claimant to control his depression and get a good night's sleep to avoid break through seizures. Claimant had an efferential kind of tremor that started before he had seizures.

Dr. Kumar noted that Claimant has fatigue all the time and found that Claimant has a chronic fatigue syndrome.  (Tr. at 1335.)

Consolidated Public Retirement Board

On March 11, 2008, just prior to onset, Dr. Elkins completed a Public Employees Retirement System Physician's Disability Report, Re-examination form on which he opined that Claimant has a seizure disorder and that, as a result, Claimant is unable to perform his previous state employment or any other kind of substantial gainful activity.  (Tr. at 1418.)

On March 18, 2008, just prior to onset, Dr. Clapp completed a Public Employees Retirement System Physician's Disability Report, Re-examination form on which he opined that Claimant has a seizure disorder and that he should engage in no activity that would be dangerous if loss of consciousness were to occur.  He opined that the period of limitation is "indefinite at this point," but when asked if Claimant could engage in his previous state employment or other substantial gainful activity he did not answer "yes" or "no," but stated instead, "uncertain in my mind."  (Tr. at 1419.)

On September 4, 2008, the Consolidated Public Retirement Board wrote that Claimant's application for disability retirement benefits had been granted.  (Tr. at 1398.)

State Agency Assessments

On April 25, 2008, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with an inability to climb ladders, ropes and scaffolds and crawl, an occasional ability to climb ramps and stairs, balance, stoop, kneel and crouch, a need to avoid concentrated exposure to extreme cold and heat and a need to avoid even moderate exposure to hazards.  (Tr. at 1340-45.)

On May 1, 2008, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant's mental impairments were not severe. (Tr. at 1357-70.)

On July 15, 2008, a second State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work, can occasionally climb ladders, ropes and scaffolds, should avoid concentrated exposure to extreme cold, heat, humidity, vibration, fumes, odors, dusts, gases and poor ventilation and should avoid even moderate exposure to hazards. (Tr. at 1375-83.)

On August 9, 2008, a second State agency medical source completed a Psychiatric Review Technique form and opined that Claimant's mental impairments were not severe. (Tr. at 1384-97.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in finding that Claimant could perform jobs when the vocational expert testified that when Claimant's complaints were fully credited, there were no jobs available. (Pl.'s Br. at 8-9.) In his reply, Claimant argues that his seizures are not under good control, and that he has suffered a total of thirteen seizures since February 13, 2008. (Pl.'s Reply at 1-7.)

The Commissioner argues that the ALJ was not required to give the Claimant full credibility in this case and that when his credible limitations were included in a hypothetical question, the vocational expert identified jobs that Claimant could perform. (Def.'s Br. at 7-10.)

The court finds that the ALJ's decision is supported by substantial evidence. In

14

particular, the Commissioner met his burden at step five of the sequential analysis.  At the administrative hearing, the ALJ asked the vocational expert two hypothetical questions, the one cited by Claimant, which assumes full credibility of Claimant's allegations (in response to which the vocational expert could identify no jobs), and one that included limitations supported by substantial evidence of record (in response to which the vocational expert identified light and sedentary jobs).  (Tr. at 76-78.)

In his decision, the ALJ determined that Claimant's subjective complaints were not entirely credible, and his findings comply with the applicable regulations, case law and social security ruling ("SSR") and are supported by substantial evidence.  20 C.F.R. § 404.1529(b) (2009); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).  The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and the frequency and other factors related to his seizures, precipitating and aggravating factors and Claimant's medication.  (Tr. at 46-47.)

The evidence of record indicates that Claimant reported four seizures:

March 21, 2007 -  observed at car dealership - (Tr. at 261)
March 28, 2007 -  not observed -  (Tr. at 448)
January 4, 2008 - observed car wreck - (Tr. at 524)
July 30, 2008 - not observed - partial - (Tr. at 1203-04)
April 21, 2009 - not observed -  (Tr. at 1409-10 ).

Only two of these seizures, one of which was a partial seizure, actually occurred after Claimant's alleged onset.

In any event, the ALJ provided ample explanation for his determination that Claimant's subjective complaints were not entirely credible.  With respect to Claimant's seizures in particular, the ALJ pointed out that at the time of his seizure in January of 2008,

when he wrecked his car, his Depakote level was sub-therapeutic.  He further noted that

> [i]n February 2008, Dr. Kumar observed that claimant's medication had been changed from Keppra to Depakote and he had no seizures for eight months; then, his medication was switched to Dilantin without further seizure activity (Exhibit 9F).  At hearing, claimant testified that he had been returned to Depakote at a lower dosage level.

(Tr. at 45-46.)

> The ALJ further noted that

> The claimant is understandably concerned about his seizure disorder, given the January 2008 car accident and the subsequent loss of his driver's license. In March 2008, Dr. Elkins noted that claimant's job involve driving, so he was unable to work (Exhibit 8F, p. 4).  In support of claimant application for the Public Employees Retirement System, Dr. Clapp that same month indicated that, due to his seizure disorder, claimant could not engage in any activity that would be dangerous if loss of consciousness were to occur (Exhibit 29F, p 2).  The undersigned agrees, but such statements would not preclude claimant from performing work as described above.

(Tr. at 46.)

The ALJ ultimately adopted the opinion of the State agency medical source who limited Claimant to light work, further limited by nonexertional limitations.   He acknowledged that treating sources opined that Claimant should avoid driving and hazards that would be dangerous if loss of consciousness were to occur.  (Tr. at 46-47.)  The ALJ's residual functional capacity adequately contemplates limitations resulting from Claimant's seizure impairment.   When the ALJ presented a hypothetical question to the vocational expert including such limitations, the vocational expert identified light and sedentary jobs that Claimant could perform.  (Tr. at 76-77.)

In his reply, Claimant refers to additional seizures he has had that were not before the ALJ.  The court cannot consider this evidence. Such evidence is best presented in support of a new application.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the Commissioner's decision is AFFIRMED and this matter is DISMISSED from the docket of this court.

The Clerk is directed to transmit copies of this Memorandum Opinion to all counsel of record.

**ENTER**: March 23, 2012

Mary E. Stanley
United States Magistrate Judge

17